ORIENT OVERSEAS CONTAINER
LINE, Third Party Plaintiff,

v.

JOHN T. CLARK & SONS OF BOS-
TON, INC., Third Party Defendant
and Fourth Party Plaintiff,

v.

Norway Seafoods, Inc. f/k/a Frinor
U.S.A., Inc., American Seafoods Inter-
national, LLC, and Kellaway Intermo-
dal & Distribution Systems, Inc.,
Fourth Party Defendants.

No. CIV.A. 01–11962MBB.

United States District Court,
D. Massachusetts.

Oct. 23, 2002.

MEMORANDUM AND ORDER RE: MOTION FOR PARTIAL SUMMARY JUDGMENT OF FOURTH PARTY DEFENDANTS, NORWAY SEAFOODS, INC. AND AMERICAN SEAFOODS INTERNATIONAL, LLC (DOCKET ENTRY # 30); KELLAWAY INTERMODAL & DISTRIBUTION SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (DOCKET ENTRY # 32)

BOWLER, Chief United States Magistrate Judge.

Pending before this court is a motion for summary judgment filed by fourth party defendant Kellaway Intermodal & Distribution Systems, Inc. ("Kellaway") (Docket Entry # 32) and a motion for partial summary judgment filed by fourth party defendants Norway Seafoods, Inc. ("Norway") and American Seafoods International, LLC ("American Seafoods") (collectively: "Norway") (Docket Entry # 30). After conducting a hearing on September 11, 2002, this court took the motions (Docket Entry ## 30 & 32) under advisement.

*PROCEDURAL BACKGROUND*

This case revolves around a March 1998 shipment of frozen fish that traveled from a storage facility owned and operated by Norway and American Seafoods [1] in New Bedford, Massachusetts via a refrigerated

Gregory G. Barnett, Martin F. Casey, Casey & Barnet, L.L.C., New York, NY, for Atlantic Coast Fisheries Corporation, Plaintiff.

Henry P. Gonzalez, Rodriguez O'Donnell Fuerst, Gonzalez & Williams, Washington, DC, Charles E. Murphy, Tisdale & Lennon, L.L.C., Don P. Murnane, Jr., Freehill, Hogan & Mahar, New York, NY, for Icepak, Inc., Orient Overseas Container Lines, A.P. Moller, Svendborg & D/S AF, Defendants.

1. For purposes of Norway and American Seafoods' summary judgment motion, the parties agree that Norway and American Seafoods owned and operated the storage facility at the time of the storage in late 1997 and early 1998. In point of fact, however, Norway, formerly a Massachusetts corporation, was voluntarily dissolved. (Docket Entry ## 18 & 23, ¶¶ 4). Third party plaintiff John T. Clark and Sons of Boston, Inc. ("Clark") alleges that the dissolution occurred on December 1, 2000. (Docket Entry # 18, ¶ 4). Section 102 of Massachusetts General Laws chapter 156B allows suit against a voluntarily dissolved corporation for a three year period after dissolution. American Seafoods, a Delaware corporation registered to do business in Massachusetts, acquired certain assets of Norway in 1999. (Docket Entry ## 18 & 23, ¶¶ 5). Clark further alleges that American

container driven by a Kellaway driver to the Paul W. Conley Marine Terminal ("the Conley Terminal") in Boston. Clark provided stevedoring and terminal operator services at the Conley Terminal for the fish prior to their transport on a barge to Port Newark, New Jersey. (Docket Entry # 8). When the fish eventually arrived by boat in Le Havre, France, it was discovered that the temperature setting for the container was incorrect. The buyers rejected the fish. (Docket Entry ## 40 & 50, ¶¶ 19).

Atlantic Coast Fisheries Corporation ("Atlantic"), the owner and exporter of the cargo of fish, initially commenced this litigation in the United States District Court in the District of New York ("the New York court") in June 2000 against defendants The M/V Magleby Maersk ("the Magleby"), Icepack, Inc. ("Icepack"), Orient Overseas Container Line ("OOCL"), A.P. Moller ("Moller") and Svendborg & D/S AF ("Svendborg"). In May 2001, OOCL, after filing an answer and asserting various cross claims, filed a third party complaint against third party defendants Columbia Coastal Transport, LLC ("Columbia"), Clark and the Conley Terminal.[2]

In August and September 2001, Atlantic settled with OOCL and Icepak for the sum of $62,500 and dismissed without prejudice and without costs its claims against the Magleby, Moller and Svendborg. (Docket Entry # 37, New York Docket). Cross claims among and between Icepak, Moller, the Magleby, Svendborg and OOCL were also dismissed. OOCL and Columbia dismissed their third party claim and counterclaim against each other with prejudice and without costs.

Accordingly, although the above admiralty claims are therefore no longer part of this action, OOCL's third party counterclaims against Clark and the Conley Terminal remain active. In the New York court in May 2001, Clark filed a motion to dismiss the third party counterclaim for lack of personal jurisdiction. Clark subsequently withdrew the motion and OOCL and Clark stipulated to a trial in the United States District Court for the District of Massachusetts. The New York court therefore transferred the case to this district in November 2001.

On March 13, 2002, Clark filed a timely fourth party complaint naming Norway, American Seafoods and Kellaway as fourth party defendants respectively in counts I, II and III. The complaint seeks indemnity or contribution on the basis that Norway, American Seafoods and/or Kellaway were negligent in failing to maintain the cargo at the proper temperature while the cargo was in their possession, custody or control. The pending summary judgment motions seek dismissal of the three counts due to each third party defendant's lack of fault. Kellaway additionally moves to dismiss the

Seafoods did not register to do business in Massachusetts until January 27, 2000, after the events in question took place. (Docket Entry # 18, ¶ 5).

2. The third party complaint, unfortunately, is not contained in the file. The above information is therefore taken from the New York docket. That docket reflects that OOCL filed the third party complaint on May 24, 2001, and that the Conley Terminal did not file an answer. Any counterclaim against the Conley Terminal may, upon review of the actual counterclaim filed by OOCL, be subject to a

show cause order to dismiss the counterclaim for want of prosecution. In addition, inasmuch as this court allowed OOCL's motion to amend the caption of the case, the present caption of the case does not contain the Conley Terminal as a third party defendant. (Docket Entry # 28).

OOCL is directed to file a copy of the third party complaint within 14 days of the date of this Order. For purposes of this Order, the parties concur that OOCL's claims against Clark are for indemnity as reflected in their joint statement. (Docket Entry # 8, p. 2).

fourth party complaint due to the absence of admiralty jurisdiction. Kellaway submits that the negligent transit claim is not a maritime claim and does not arise out of the same set of facts as the former parties' now dismissed maritime claims in order to support ancillary jurisdiction.[3]

## STANDARD OF REVIEW

The standard of review for the summary judgment motions is well established. "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corporation*, 63 F.3d 32, 36–37 (1st Cir.1995) (quoting Rule 56, Fed.R.Civ.P.).

In deciding whether a factual dispute is genuine, this court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992) (citing *Anderson*). "A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir.1989) (citing *Anderson*). In essence, the "test is whether, as to each essential element, there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997).

Clark, as the nonmoving party, is "entitled to have the credibility of [its] evidence as forecast assumed, [its] version of all that is in genuine dispute accepted, and all internal conflicts in the evidence resolved favorably." *Blanchard v. Peerless Insurance Company*, 958 F.2d 483, 489 (1st Cir.1992) (internal ellipses and quotations marks omitted). In seeking to avoid summary judgment, Clark relies primarily on the affidavit of its expert, and, to a lesser degree, on an admission, later retracted, by Kellaway's Chief Financial Officer. Summary judgment is generally appropriate against the nonmoving party where that party relies on "conclusory allegations, improbable inferences, and unsupported speculation." *DeNovellis v. Shalala*, 124 F.3d at 306. The same principle applies to expert affidavits. In order to defeat summary judgment, "the expert opinion must be more than a conclusory assertion about ultimate legal issues." *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir.1993). In other words, Clark's expert must do more than present a conclusory statement. Thus, "Where an expert presents 'nothing but conclusions— no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected,' such testimony will be insufficient to defeat a motion for summary judgment." *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d at 92. As discussed *infra*, this principle is particularly apropos to Clark's exclusive reliance on its expert's opinion to defeat Norway's summary judgment motion.

## I. MOTION FOR PARTIAL SUMMARY JUDGMENT OF FOURTH PARTY DEFENDANTS, NORWAY SEAFOODS, INC. AND AMERICAN SEAFOODS INTERNATIONAL, LLC (DOCKET ENTRY # 30)

The parties do not dispute the majority of the events surrounding Norway's stor-

---

**3.** Kellaway does not ask this court to exercise its discretionary authority to dismiss any ancillary state law claims under 28 U.S.C. § 1367(c). Rather, Kellaway argues that the claim does not arise out of the same set of facts and, accordingly, there is no ancillary jurisdiction under 28 U.S.C. § 1367(a).

age of the cargo. Rather, they strongly dispute the material fact of what temperature the fish were kept at while stored at the storage facility before their transport on the Kellaway truck. Viewing the record in Clark's favor for purposes of summary judgment, the record evidences the following.

From December 1997 to February 1998, Atlantic delivered four loads of frozen fish consisting of monkfish, dogfish and squid to the Frionor[4] cold storage facility ("the storage facility") owned and operated by Norway in New Bedford. The bills of lading instructed Norway to maintain the frozen product at zero degrees Fahrenheit. Zero degrees Fahrenheit equates with negative 18 degrees Celsius. The storage facility consisted of two freezers, to wit, a 24,000 square foot freezer and a 36,000 square foot freezer with loading docks outside.

During 1997 and 1998, as well as to date, Norway maintained a daily temperature chart on the side walls outside each freezer. Interior temperatures of the freezers are thereby checked on a daily basis. Ordinarily, Norway, which was not notified of this suit until recently, does not retain the temperature charts beyond a two year period.[5] Norway's diligent search for the records in question proved fruitless.

From December 1997 through March 1998, Norway had a business practice of setting the temperature of the smaller freezer at a range of minus five degrees to minus ten degrees Fahrenheit. Norway also had a business practice of setting the larger freezer to maintain an interior temperature between minus three degrees to minus eight degrees Fahrenheit. These are the temperatures that have been set in the two freezers since their inception.

Norway stored the fish received from Atlantic in both freezers. Checking the refrigeration and repair bills for December 1997 through March 1998, there were no repair records for emergency repairs to either freezer. The only repair record relating to the equipment used for cold storage consisted of a March 16, 1998 invoice[6] to replace the shaft seal and disc pack on one of the two compressors used to operate the freezers. Although Norway had two compressors, it needed only one to chill both freezers. Accordingly, if one compressor was being repaired, the other compressor provided the necessary chilling for both freezers. Standard procedure would be to shut down one of the two compressors upon smelling ammonia, which is the first indication of a seal's deterioration. The other compressor would then operate during the three day repair period. Humberto C. Rego ("Rego") of Norway was not aware of any problem relating to the operation of either freezer during this time period. Thus, the only reasonable inference is that neither freezer broke down or otherwise malfunctioned between December 1997 and March 1998.

At any given time, the two freezers contained between seven to 15 million pounds of frozen fish. During the time period of December 1997 to March 1998 the poundage fluctuated in and around nine million pounds. Other than Atlantic's claim for its 41,974 pounds of damaged cargo, Norway did not receive any other claim against it for insufficient freezing of stored cargo for this time period.

---

4. Norway was formerly known as Frionor U.S.A., Inc.

5. Norway only keeps the charts if a problem arises. At the summary judgment hearing, Clark's counsel represented that it did not seek an adverse inference for any spoilation.

6. The date of service cannot be determined.

Also during this time period, Norway had a practice of spot checking each delivery before storing the product in the storage facility. The spot check consisted of placing a probe into one or more containers of a delivery to determine the cargo's temperature. Norway always completed a form if the temperature was above zero degrees Fahrenheit. Rego is not aware of any instance in 1997 and 1998 when spot checking revealed temperatures above zero degrees Fahrenheit. To Rego's knowledge, no Norway employee removed or opened the stored boxes of fish while they were inside the freezers.

Atlantic hired Kellaway to transport the cargo from Norway's cold storage facility in New Bedford to the Conley Terminal in Boston. The usual practice during the time period of December 1997 to March 1998 was for Atlantic to notify Norway that it wanted to remove the stored cargo. Norway then issued a release to Atlantic with the truck line indicated as the customer pickup.

On March 17, 1998, the Kellaway driver picked up the refrigerated container at Atlantic's facility in Randolph, Massachusetts and drove it to Norway's cold storage facility in New Bedford. The driver arrived at the storage facility at 8:00 a.m. He departed the facility with a fully loaded truck at 2:15 p.m.

At 10:20 a.m. on March 17, an Atlantic employee signed the release order generated that day for the cargo in question. With the signing of a release, Norway's practice would be to take the fish from the freezers to the loading dock. Norway generally does not conduct spot checks of the temperature of the cargo upon delivery. Where, as here, the product would travel overseas, typically Norway's employees remove the fish from the freezers on pallets using pallet jacks and take it to the loading dock. Although the loading dock area is not refrigerated or heated, it has dock or box seals so that when the pick-up truck backs up to the loading dock, there is not a large amount of infiltration from outside ambient air.

On March 17, Norway employees took the fish from the storage freezers out to the loading dock. On the loading dock, Atlantic employees or individual[s] acting on their behalf then placed foreign language labels on the boxes. Viewing the record in Clark's favor, Norway employees then moved the relabeled boxes or cartons with pallet jacks into the refrigerated container, designated container OOLU 598 5993. Once inside the refrigerated container, commonly referred to as a "reefer," Atlantic Coast employees or individuals acting on their behalf removed the boxes off the pallets. The entire process took approximately three hours.

The outgoing short form bill of lading from Norway to Atlantic dated March 17, 1998, reflects the delivery of 41,974 pounds of fish in 2,148 boxes or cases. Significantly, the document contains the signature of the Atlantic representative immediately below the typed statement, "Received the Above in Good Order." It also cautions the recipient to, "Count Your Freight—You Have Signed For It" with the warning "Perishables—Maintain 0 deg. Fahrenheit or lower." (Docket Entry # 31, Ex. 8).

In shipping the cargo from New Bedford to France, Atlantic contracted with Icepak to have Icepak transport the frozen fish from Boston to Le Havre on board the Magleby departing from New York. Icepak subcontracted with OOCL to transport the cargo from Boston to New York.

In anticipation of receiving a frozen cargo, OOCL, through its agent or vendor Romar Transportation Company ("Romar"), conducted a pretrip inspection

("PTI") of container OOLU 598 5993 on March 10, 1998. A PTI is a series of tests on the refrigerated container to verify that the container will bring the inside temperature of the container down to the specified or required temperature for the voyage. In other words, the PTI tests the cooling cycle to make certain the unit is working. The subject container, built in 1996, passed the PTI at which time a Partlow chart was placed on the container. The power of the container was turned off at the end of the PTI. A Partlow chart is an automatic recording of the Celsius temperature of the return flow air in the refrigerated container. The time of day in Eastern Standard time ("EST") is only loosely designated as falling either before or after noon or midnight on a particular date.

Container OOLU 598 5993 also had a data recorder. The data recorder is a microprocessor that records return air temperature from a return air sensor inside the container [7] at a particular time when an event occurs, such as when the power of the refrigerated container is turned on. The time of day on the microprocessor is recorded in Greenwich mean time ("GMT") [8] or Hong Kong time, as suggested by the discrepancy between the times of the PTI on the Partlow chart versus the data recorder's event report ("event report"). [9] The data recorder therefore provides a second means of measuring the inside air of the refrigerated container.

Benitez opines that the refrigeration unit on the container or "genset" was turned on with the doors shut before the cargo was loaded into the container on March 17. Notwithstanding other evidence in the record, [10] Benitez adequately supports this view by comparing the uniform drops in temperature on the Partlow chart depicted when the unit was empty and pretested on March 11 and when the unit was turned on on March 17. Benitez additionally reasons that it is customary in the industry to turn the genset on before loading a frozen cargo. Viewing the record in Clark's favor, the genset was turned on before the fish were loaded into the container.

Both the data recorder's event report ("the event report") and the Partlow chart reflect the PTI. The Partlow chart sets the PTI as occurring in the mid-afternoon EST on March 10, 1998. The pretrip inspection sheet reflects that the unit was turned off at the end of the test which, like the date on the Partlow chart, took place on March 10. After the genset was turned on, the temperature on the Partlow chart dropped uniformly and steeply to approximately negative 15 degrees Celsius. It then gradually rose over a 36 hour period and reached a high temperature of approximately negative three degrees Celsius. The temperature roughly matched the ambient air outside the container during the next seven days until March 17.

The event report notes that the power of the genset was turned on March 11, as opposed to March 10. The event report records the time the genset was turned on, the temperature setting at that time and the return and supply air temperatures.

---

7. The Partlow chart uses a different interior sensor to measure the return air temperature.

8. According to Leo Chung ("Chung"), the event report reflects time in units according to GMT. (Docket Entry # 36, Ex. 17, p. 61).

9. The discrepancy as to whether the microprocessor recorded GTM or Hong Kong time is not material to the decision to allow Norway's summary judgment motion.

10. The Partlow chart indicates that the genset was turned on during the afternoon of March 17.

At 02:31 GMT or Hong Kong time on March 11, the temperature setting was set at negative 18 degrees Celsius.

As shown on the event report, the next event took place on March 18, as opposed to the March 17 date reflected on the Partlow chart. Specifically, on March 18, the power of the genset was turned on at 03:04 GMT or Hong Kong time. The temperature was set at negative 18 degrees Celsius with supply air recorded at negative 5.8 degrees Celsius, cooler than the recorded .9 degrees Celsius of the return air inside the container.[11]

Significantly, when the temperature reached negative 13 degrees Celsius almost three hours later at 05:53 GMT or Hong Kong time on March 18, the temperature setting of the genset was changed from the proper negative 18 degrees Celsius setting to an improper negative one degree Celsius setting, according to the event report. At that time, the return air inside the container was recorded at negative 13 degrees Celsius.

The Partlow chart shows this change as occurring on the afternoon of March 17, EST. In particular, on March 17 the Partlow chart shows a steep and uniform drop in temperature from approximately negative one degree Celsius to negative 15 degrees Celsius. Before 6:00 p.m. EST on March 17, the chart then records the temperature rising for a period of approximately 36 hours until reaching a high of approximately negative one degree Celsius. The rising temperature corresponds with the doors being opened and the fish loaded into the container, as maintained by Clark's expert and viewing the record in Clark's favor.

Benitez posits that the temperature setting of the genset was changed from a setting of negative 18 degrees Celsius to a setting of negative zero degrees Celsius less than three hours after the genset was turned on. Based on the Partlow chart and having reasonably concluded that the genset was turned on before the loading of the cargo, Benitez opines that:

If the cargo had been frozen to [negative] 18 degrees Celsius at the time of loading, the cargo itself would have helped to chill the air within the container, and the temperature within the container would not have risen at the rate depicted on the Partlow Chart. In my opinion, the temperature of the fish when loaded into the container was not lower than [negative] 12 degrees Celsius and was probably higher.

(Docket Entry # 48, ¶ 8).

The best support or explanation for Benitez' conclusion is his statement that, "Fish frozen to [negative 15 degrees Celsius] would have maintained a temperature inside the container almost as low as the temperature of the fish for at least a few hours, even if there was no refrigeration inside the container." (Docket Entry # 48, Ex. A). In other words, the fish, if frozen to a temperature of negative 15 degrees Celsius as opposed to a temperature of negative 12 degrees Celsius, would have helped maintain the negative 15 degree temperature of the return air in the container for a few hours. Instead, as shown on the Partlow chart, the return air immediately began to rise from the low of negative 15 degrees Celsius when the doors were opened and loading began.[12]

11. This temperature difference reflects a cooling of the inside temperature of the container.

12. Benitez places the opening of the doors and commencement of the loading as occurring when the temperature began to rise from the recorded low of negative 15 degrees Celsius on March 17, as shown on the Partlow chart.

Benitez' hypothesis amounts to an improbable inference. In short, it is highly improbable that a difference of between three to six degrees Celsius in the temperature of the fish [13] would reflect and impact the return air temperature of the container such that it would not otherwise stay at a lower temperature for a few hours. Accordingly, Benitez' opinion cannot withstand summary judgment on the material fact of what temperature Norway kept the fish at its storage facility prior to releasing the cargo to Atlantic. Furthermore, as noted by Kellaway's Vice President, the variance between negative 18 degrees Celsius and negative 25 degrees Celsius "is minimal." (Docket Entry # 31, Ex. 7, p. 53).

Norway unquestionably provided sufficient evidence for a jury to find that it exercised due care during the storage. No other complaints were lodged against Norway during this period even though the fish were stored with a significant amount of other cargo. Norway consistently maintained a practice of keeping the storage freezers below negative 18 degrees Celsius. No emergency repairs were done to the freezers during the relevant period.

Benitez nevertheless surmises that the temperature of the fish differed by a mere six degrees Celsius based on the ability of the fish to cool the return air of the interior of the container when being loaded with doors opening and closing for a three hour period. He offers no mock experiments measuring the return air temperature of a similarly sized container with a similarly sized cargo being loaded under similarly pre-cooled conditions. It simply defies logic that based on the return air temperature of the refrigerated container shown on the Partlow chart that Benitez can measure the temperature of the cargo as differing by only approximately six degrees Celsius or, as opined in the May 21, 2001 expert report, differing by only three degrees Celsius.

When the cargo arrived at the Conley Terminal, Clark typically generated a trailer interchange receipt ("TIR"). It was Clark's general practice to check the temperature on the container and make a notation on the TIR if the temperature differed from the setting on the TIR. When the container was delivered to the Conley Terminal in Boston at or around 3:37 p.m. EST on March 17, Clark's trailer interchange receipt from Kellaway notes the temperature setting at zero degrees Fahrenheit. The TIR also lacks any notation indicating a problem with the temperature on the container. After the Kellaway driver arrived at the Conley Terminal, presented his paperwork and a TIR was generated, the driver would be directed to an area where the container could be plugged into an external power source and the driver could then depart.

*DISCUSSION*

■ When filed, the New York court had admiralty jurisdiction in both contract and tort to hear the claims involving the cargo's allegedly negligent transport aboard the Magleby. In contract actions, admiralty jurisdiction arises when the subject matter is wholly or purely maritime in nature. *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines*, 230 F.3d 549, 555 (2d Cir.2000). The fundamental inquiry in a contract dispute turns on " 'whether the contract was or was not a *maritime contract* and whether maritime or not mar-

---

**13.** Benitez also notes that the temperature of the fish was "probably higher" than negative 12 degrees Celsius. He fails to specify how much higher. Even considering this non-specific statement about a crucial issue, i.e., the range in temperature of the fish, the statement does not defeat Norway's summary judgment motion.

itime depend[s] on the *subject-matter* of the contract.'" *Sirius Ins. Co., Ltd. v. Collins,* 16 F.3d 34, 37 (2d Cir.1994) (internal ellipses omitted). The Icepak bills of lading show that the cargo was to travel from Boston to Le Havre. To the extent any land shipment was required, it was incidental to the delivery of the cargo for loading at Boston on a barge to New Jersey and the eventual transport aboard the Magelby to Le Havre.[14] Neither Norway nor Kellaway are named in the Icepak bill of ladings. (Docket Entry # 40, Ex. 1).

If viewed as a tort action, the alleged negligence occurring on water, at least with respect to the former parties, aboard the traditional maritime instrument of a vessel, satisfies both the location and nexus tests. *See generally Carey v. Bahama Cruise Lines,* 864 F.2d 201, 207 n. 4 (1st Cir.1988). The original claims and cross claims in the complaint and answers therefore fell under this court's admiralty jurisdiction.

In contrast, Clark's indemnity or contribution claim against Norway cannot be characterized as either a maritime contract claim or a maritime tort claim within the reach of this court's admiralty jurisdiction under Article III, section two of the Constitution and 28 U.S.C. § 1333. *See Insurance Company of North America v. S/S Cape Charles,* 843 F.Supp. 893, 894–895 (S.D.N.Y.1994) (third party plaintiff's claim against trucking company's incidental land based leg of overseas voyage for damages to frozen frog legs was not mari-

time contract or tort claim cognizable in admiralty).[15] Although not cognizable in admiralty, this court may exercise supplemental jurisdiction over the indemnity and contribution claims against Norway under 28 U.S.C. § 1367 ("section 1367").

Under the Judicial Improvements Act of 1990, supplemental jurisdiction, which encompasses claims involving "the same nucleus of operative facts," *Roche v. John Hancock Mutual Life Insurance Company,* 81 F.3d 249, 256 (1st Cir. 1996), automatically extends to claims against additional parties. 28 U.S.C. § 1367(a). Section 1367 essentially codifies the reasoning and analysis used in *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *Rodriguez v. Doral Mortgage Corporation,* 57 F.3d 1168, 1175 (1st Cir.1995). Moreover, before its enactment, the First Circuit recognized pendent party jurisdiction in admiralty for claims arising "'out of a common nucleus of operative facts.'" *Ponce Federal Bank, F.S.B. v. Vessel Lady Abby,* 980 F.2d 56, 58 (1st Cir. 1992).[16]

The present claims, involving the same cargo of frozen fish, arise out of the same common nucleus of operative facts. *See, e.g., Insurance Company of North America v. S/S Cape Charles,* 843 F.Supp. at 895 (exercising supplemental jurisdiction inasmuch as the underlying admiralty action arose "out of same shipment of frog legs"); *Antilles Insurance Co. v. M/V Abi-*

---

14. A mixed contract involving land and sea carriage gives rise to admiralty jurisdiction where "the non-maritime aspects of the transportation are 'merely incidental.'" *Berkshire Fashions, Inc. v. M.V. Hakusan, II,* 954 F.2d 874, 880 (3rd Cir.1992); *see also Sirius Ins. Co. v. Collins,* 16 F.3d 34, 37 (2d Cir.1994).

15. In *Cape Charles,* the trucking company was not a party to a bill of lading but instead was

liable under a separate contract. *Insurance Company of North America v. S/S Cape Charles,* 843 F.Supp. at 894.

16. Although the *Ponce* decision post-dates the enactment of the statute, section 1367 did not apply because it was a "pre-statute[ ] case." *Ponce Federal Bank, F.S.B. v. The Vessel Lady Abby,* 980 F.2d at 58.

*tibi Concord*, 755 F.Supp. 42, 45 (D.P.R. 1991) (whether damage to cargo occurred at sea or during land transit satisfied *Gibbs* test); *but cf. Galt G/S v. Hapag-Lloyd AG*, 60 F.3d 1370, 1374–1375 (9th Cir.1995).

"Suits against operators for cargo damage or loss while in storage are governed by state rather than admiralty law." *Whitcombe v. Stevedoring Services of America*, 2 F.3d 312, 314 (9th Cir.1993) (applying state law to suit against terminal operator for cargo loaded in container and placed on loading area at port). Norway is more removed from maritime activity than the defendant in *Whitcombe* inasmuch as Norway is not even a terminal operator but is rather an inland warehouser. Accordingly, Norway's liability to Clark is based on state law, which in this instance is the law of Massachusetts.[17] *See also Project Hope v. M/V IBN SINA*, 250 F.3d 67, 73 n. 3 (2d Cir.2001) (rejecting application of admiralty common law to exclusively nonmaritime contract for motor carriage).

In counts I and II of the fourth party complaint, Clark asserts indemnity and contribution claims based on the negligence of Norway and American Seafoods. Indemnity allows a party "who is without fault ... to recover from the wrongdoer the entire amount of his loss." *Slocum v. Donahue*, 44 Mass.App.Ct. 937, 693 N.E.2d 179, 182 (1998). It is permitted only where the indemnitee did not join in the wrongful act but is nonetheless held derivatively or vicariously liable for the wrongful act. *Slocum v. Donahue*, 693 N.E.2d at 182. In contrast, contribution "is based on the shared fault of the joint tortfeasors." *Slocum v. Donahue*, 693 N.E.2d at 182. It allows joint tortfeasors recourse against one another for causing injury or damage to another party. *Slocum v. Donahue*, 693 N.E.2d at 182–183. " 'Contribution and indemnity are mutually exclusive remedies.' " *Slocum v. Donahue*, 693 N.E.2d at 183.

Under Massachusetts law, a bailee for hire such as Norway has the irrevocable burden of proof to show that it "exercised due care to prevent loss or harm to the customer's property." *Rexford v. Sears Corporation*, 1992 WL 277072 at *1 (Mass.App.Div. Sept. 28, 1992) (citing *Knowles v. Gilchrist Co.*, 362 Mass. 642, 289 N.E.2d 879, 885 (1972)). The cited and seminal case of *Knowles* changed preexisting law, which imposed only a burden of production on the bailee, *see Nissho Iwai American Corp. v. New England Warehousing & Distribution, Inc.*, 650 F.Supp. 147, 148 (D.Mass.1986) (discussing how *Knowles* changed preexisting law), and placed the burden of proof on the bailee. Under *Knowles*, once the bailor establishes the "delivery of the property to the bailee in good condition and the failure to redeliver the property upon timely demand, the burden of proof is irrevocably fixed upon the bailee to prove by a fair preponderance of the evidence that he has exercised due care." *Knowles v. Gilchrist Co.*, 289 N.E.2d at 885. The holding in *Knowles* extends to "all bailment for hire cases, whether brought in contract or tort, in which the bailee has exclusive control over the property at the time it was destroyed or damaged." *Knowles v. Gilchrist Co.*, 289 N.E.2d at 885.

---

**17.** The primary difference between Massachusetts and maritime law "concerns the role of the presumption of negligence which arises in a bailment relationship." *Fletcher v. Port Marine Center, Inc.*, 1990 WL 255536 at *2 n. 3 (D.Mass. Aug.7, 1990); *see generally Dunavant Enterprises, Inc. v. Strachan Shipping Co.*, 730 F.2d 665, 668 (11th Cir.1984) (discussing bailments under maritime law).

■ As a bailee, Norway was "obligated to exercise ordinary and reasonable care in the protection of [the] bailed goods." *Fireman's Fund American Insurance Co. v. Capt. Fowler's Marina, Inc.*, 343 F.Supp. 347, 350 (D.Mass.1971). The degree of care required under the circumstances is a question of fact. *Rabinovitzch v. Sea Crest Cadillac–Pontiac, Inc.*, 368 Mass. 814, 335 N.E.2d 698, 699 (1975).

■ Viewing the record in Clark's favor, Atlantic delivered the fish to Norway in good condition. The underlying summary judgment burden therefore falls on Norway to show that it exercised due care to prevent damage to the cargo. Norway received the Icepak bills of lading containing the instructions to store the fish at zero degrees Fahrenheit in conjunction with the deliveries of the fish. (Docket Entry # 40, Ex. 1 & 3).

Norway presents more than sufficient evidence to show that it exercised due care over the cargo and kept the cargo at a temperature below zero degrees Fahrenheit. Relying on Benitez' opinion, Clark fails to provide any evidence, other than an improbable inference, to show that the cargo was stored above zero degrees Fahrenheit. The record therefore warrants summary judgment in Norway's favor on counts I and II of the fourth party complaint.

II. *KELLAWAY INTERMODAL & DISTRIBUTION SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (DOCKET ENTRY # 32)*

■ In addition to the foregoing evidence and resolving disputed issues of material fact in Clark's favor, before loading the cargo, the genset was turned on and the container cooled to approximately negative 15 degrees Celsius. The cooling took less than one hour. After this pre-cooling process, the doors of the container were opened and loading commenced. The loading process took approximately three hours.

The event report reflects that the genset was turned on at 3:04 Hong Kong or GMT time on March 18, 1998. As further depicted in the event report, slightly less than three hours later, the genset was reset to a temperature of negative one degree Celsius. Benitez similarly opines that the genset was changed from negative 18 degrees Celsius to zero degrees Celsius less than three hours after the genset was turned on.

The Kellaway driver arrived at the cold storage facility in New Bedford at 8 a.m., left at approximately 2:15 p.m. and arrived at the Conley Terminal at approximately 3:37 p.m. EST on March 17, 1998, or ten to 15 minutes earlier. Benitez reasonably opines that the temperature setting of the genset was reset from negative 18 degrees Celsius to zero degrees Celsius while the container was in Kellaway's possession, custody or control. Moreover, viewing the record in Clark's favor, discrepancies in the times reflected on the Partlow chart and the event report limit the ability to accurately or definitively set the time period as to when the temperature setting was changed from negative 18 degrees Celsius to negative one degree Celsius on March 17 or 18, 1998.[18]

Although Kellaway provides evidence to the contrary, it is a genuine issue of mate-

---

18. The details of the discrepancies are set forth in paragraph ten of Benitez' August 2002 affidavit and in the May 21, 2001 report.

rial fact as to when the genset was reset and whether this occurred while Kellaway had possession or custody of the cargo.

Turning to Kellaway's alternative argument that this court lacks subject matter jurisdiction, Clark's claims against Kellaway for cargo damage occurring on land during the transport from New Bedford to Boston do not, standing alone, lie within the admiralty jurisdiction of this court. Atlantic contracted with Kellaway to transport the cargo from New Bedford to Boston and "it has long been the rule that contracts involving cargo are maritime only to the extent the cargo is on a ship or being loaded on or off a ship." *Luvi Trucking, Inc. v. Sea–Land Serv., Inc.*, 650 F.2d 371, 373 (1st Cir.1981); *see, e.g., Inbesa America, Inc. v. M/V Anglia*, 134 F.3d 1035, 1037 (11th Cir.1998); *Green Light Transport, Inc. v. Ocean Express Lines, Inc.*, 1994 WL 581898 at *2–3 (S.D.Fla. June 7, 1994). In addition, the inland carriage of goods does not fall under this court's federal question jurisdiction because the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 *et. seq.*, would not apply. *See Alaska Russia Salmon Caviar Co. v. M/V Marit Maersk*, 2000 WL 145124 at *1 n. 2 (S.D.N.Y. Feb.2, 2000) ("to the extent that ARSCC's claims arise from the inland carriage of goods, they do not fall under the COGSA or the Court's admiralty jurisdiction"). Likewise, tortious conduct occurring during the land portion of transportation for the negligent loss or damage to cargo does not fall within the admiralty jurisdiction of this court. *See Greenidge v. Mundo Shipping Corporation*, 41 F.Supp.2d 354, 356 (E.D.N.Y.1999).

For reasons stated in part I regarding supplemental jurisdiction over Clark's fourth party claims against Norway, however, this court has supplemental jurisdiction over Clark's fourth party claims against Kellaway. *See, e.g., Magana v. Hammer & Steel, Inc.*, 206 F.Supp.2d 848, 853 (S.D.Tx.2002) (exercising supplemental jurisdiction under section 1367 against transporter of steel piling sheets that injured longshoreman during unloading); *Insurance Company of North America v. S/S Cape Charles*, 843 F.Supp. at 895; *Antilles Insurance Co. v. M/V Abitibi Concord*, 755 F.Supp. at 45. Accordingly, dismissal under Rule 12(b)(1), Fed.R.Civ.P., is inappropriate.

### CONCLUSION

In accordance with the foregoing discussion, Norway and American Seafoods motion for partial summary judgment (Docket Entry # 30) is **ALLOWED** and counts I and II of the fourth party complaint are **DISMISSED**. Kellaway's summary judgment motion (Docket Entry # 32) is **DENIED**. OOCL is directed to file a copy of the third party complaint within 14 days of the date of this Order.[19] The parties shall appear for a final pretrial conference at 10:00 a.m. on November 19, 2002.

---

19. See footnote number two.