Technology v. Moore                    CV-02-146-M    05/23/03

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


<u>Technology Planning Int'l., LLC,</u>
<u>and Richard Piller,</u>
    Plaintiffs

    v.                                    Civil No. 02-146-M
                                          Opinion No. 2003 DNH 085
<u>Moore North America, Inc.</u>
<u>and Raymond Hartman,</u>
    Defendants,


## O R D E R


This litigation arises out of the parties' inability to successfully come to terms on TPI's proposed purchase of Moore's Document Automation Systems business in Dover, New Hampshire (the "DAS facility").  Pending before the court are Moore's motion for summary judgment, Hartman's motion for summary judgment, and TPI's motion for leave to file a surreply, in which it also seeks relief under Rule 56(f).


### Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable

inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support its claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party. See generally Fed. R. Civ. P. 56(e). Consequently, while a reviewing court must take into account all appropriately documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation, see Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997), as well as those allegations which have been "conclusively contradicted by [the non-moving party's]

2

concessions or otherwise," <u>Chongris v. Board of Appeals</u>, 811 F.2d 36, 37 (1st Cir. 1987).

## Discussion

I. <u>Moore's Motion for Summary Judgment</u>.

TPI's amended complaint sets forth three claims against Moore: breach of contract - failure to negotiate in good faith (count 1); breach of contract - violation of standstill period (count 2); and negligent misrepresentation (count 3). Moore moves for summary judgment as to each count. TPI objects.

### A. Count One - Breach of Contract.

In count one of its amended complaint, TPI alleges that Moore breached its obligation under the parties' Letter Agreement to "negotiate in good faith to arrive at a mutually acceptable Definitive Agreement for approval, execution and delivery on the earliest reasonably practicable date." Exhibit 1 to Hartman's memorandum, Letter Agreement, Pt. 2, para. B. In support of its motion for summary judgment, Moore says: (1) the provision obligating the parties to "negotiate in good faith" is so vague as to be unenforceable; and (2) to the extent it is an

3

enforceable agreement, the undisputed material facts establish that Moore did not breach that agreement.

In an effort to demonstrate its entitlement to judgment as a matter of law, Moore adopts a traditional approach and relies upon various documents generated during the course of the parties' negotiations, affidavits of individuals with personal knowledge of those negotiations, and legal precedent from this and other jurisdictions. While TPI objects, its memorandum in opposition to summary judgment is remarkable for its lack of even a single citation to authority pertinent to its substantive claims, as well as the lack of any discussion regarding the essential elements of those claims. Instead, TPI relies entirely upon the testimony of its principal, Richard Piller, and the affidavits of other persons with knowledge of the parties' negotiations.[1]

---

[1]    In fairness, TPI's memorandum does include citations to authority with regard to the summary judgment standard of review. It also contains a lengthy discussion of the law applicable to the court's exercise of diversity subject matter jurisdiction. Specifically, TPI devotes substantial attention to a discussion of the jurisdictional damages requirement of 28 U.S.C. § 1332. It is, however, unclear why TPI has chosen to focus on that issue, as neither defendant has asserted that this court lacks subject matter jurisdiction over TPI's claims. To be sure, Hartman says that TPI cannot, as a matter of law, establish

4

In <u>Howtek , Inc. v. Relisys</u>, 958 F. Supp. 46 (D.N.H. 1997),
this court (DiClerico, J.) addressed the enforceability of
"agreements to negotiate."

> New Hampshire law, which governs the manufacturing
> agreement between [the parties], is silent as to the
> enforceability of agreements to negotiate.  The modern
> view, and the view endorsed by most scholars, is that
> agreements to negotiate in good faith, unlike mere
> "agreements to agree," are not unenforceable as a
> matter of law.

<u>Id.</u> at 48 (citations omitted).  The court went on to observe
that, "the critical inquiry in evaluating the enforceability of
an express or implied agreement to negotiate in good faith is
whether the standard against which the parties' good-faith
negotiations are to be measured is sufficiently certain to
comport with the applicable body of contract law."  <u>Id.</u>  In this
case, however, unlike <u>Howtek</u>, the parties have no historical
manufacturing or purchasing relationship.  Accordingly, it is not
possible to identify any "discernable standards" that govern the
parties' conduct (or their expectations), in light of their prior
dealings.  TPI does not argue otherwise.

---

"damages" as an essential element of its tort claims (because it
claims TPI has been fully indemnified for its alleged losses),
but that, of course, is an entirely different issue.

5

Unfortunately, because TPI's memorandum in opposition to summary judgment consists essentially of a recitation of statements from various affidavits, it is difficult to understand exactly what "evidence" supports which essential elements of the various counts in its complaint. But, generally speaking, TPI claims that, at all material times, it remained ready and willing to come to terms on the conditions of the purchase and sale of the DAS facility; it "made numerous efforts to close the transaction" (whatever that may actually mean); it filed this suit simply "to force [Moore] to continue to negotiate"; and it "offered to drop [the] suit if [Moore] would complete the [purchase and sale agreement] and close." Second Affidavit of Richard Piller, at paras. 23, 25. In response to those efforts, TPI says it:

> and it[s] counsel were systematically stonewalled by [Moore] which changed counsel responsible for negotiating the agreement no less than three times during the latter half of February, 2002.

> Rather than "negotiate in good faith to arrive at a mutually acceptable [purchase and sale agreement] for approval, execution and delivery on the earliest reasonably practicable date," as required by the "Binding Provisions" [of the Letter Agreement], [Moore], and its seemingly never ending succession of counsel responsible for negotiating the agreement, caused more that six (6) drafts of the [purchase and

6

> sale agreement to be prepared], requiring Plaintiff to
> expend unnecessary, duplicative professional fees and
> costing Plaintiff wasteful due diligence as it tried
> continuously to complete a [purchase and sale
> agreement] and close the transaction.

Amended complaint at paras. 42-43 (emphasis supplied).


Notwithstanding the foregoing, TPI has failed to point to any evidence supportive of its claim that Moore breached the terms of the Letter Agreement by failing to negotiate in good faith. Nor has it provided any developed argument (or legal authority supporting the proposition) that merely causing several drafts of a proposed purchase and sale agreement to be prepared can, without more, constitute a breach of the obligation to negotiate in good faith. Plainly, the mere fact that the parties were unable to agree is not evidence of Moore's bad faith. Instead, TPI must point to more, such as, for example, evidence that Moore "went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement if possible." NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1st Cir. 1953). See also Appeal of Franklin Educ. Ass'n., 136 N.H. 332, 335 (1992) (noting that, under New Hampshire labor law,

7

"good faith" negotiation involves meeting at reasonable times and places in an effort to reach agreement).

    B.    Count Two - Violation of "Standstill" Provision.

In count two of its amended complaint, TPI alleges that Moore violated the "standstill" provisions of the parties' January 30, 2002, Letter Agreement.  Specifically, TPI claims:

> In the "Binding Provisions" of the Letter Agreement, TPI and [Moore] agreed that there would be a "Standstill Period" during which "Prospective Seller will not enter into any discussion or any agreement with any party regarding the transactions contemplated by this letter prior to the earlier of (a) February 22, 2002" as extended to March 27, 2002 by agreement of the parties.
>
> In spite of the "Binding Provisions" of the Letter Agreement, Plaintiff contends that [Moore] and its senior management failed to observe the "Standstill Period" by negotiating with "Door #2," an investment group led by Mr. Wendell Smith.

Amended complaint at paras. 47-48.

In support of its motion for summary judgment, Moore says it fully honored its commitment to deal only with TPI during the standstill period:

8

> From January 30th through at least the end of March
> [when TPI filed suit], Moore engaged in no substantive
> discussions with any party other than TPI concerning
> the proposed sale of the DAS Facility.  To the extent
> that Moore had any contact with third parties regarding
> the sale of the DAS Facility, such contact was limited
> to informing those entities that negotiations with TPI
> were ongoing.

Moore's memorandum at 13.  Those claims are supported by the
affidavits of various Moore employees who had been involved in
negotiations with TPI.  They are also supported by the affidavit
of Paul Rauscher, President of EMT International, Inc., one of
the other potential purchasers of the DAS Facility.  In his
affidavit, Mr. Rauscher testifies that:

> After investigating the assets and operations at the
> DAS Facility, EMT submitted to Moore, on January 24,
> 2001, a preliminary letter proposal outlining the terms
> and conditions upon which EMT would be willing to
> purchase the DAS Facility . . . .  On January 30, 2002,
> I was informed by Mr. Ray Hartman of Moore that EMT's
> purchase proposal had not been selected, that Moore had
> entered into a letter of intent agreement with another,
> unidentified proposed purchaser, and that Moore planned
> to negotiate the final terms of and complete the
> proposed sale of the DAS Facility to that other entity.
> Mr. Hartman thanked me for our offer, and indicated
> that if the deal with the other purchaser did not
> close, Moore would reconsider EMT's offer if we were
> still interested.

9

Exhibit 2 to Moore's memorandum, Rauscher affidavit at paras. 3-4.  See also Exhibit F to Hartman's memorandum, affidavit of Robert Brown at paras. 4-5 (another potential purchaser of the DAS facility, specifically denying that Hartman or any other representative of Moore ever contacted him after his group's offer to purchase the DAS facility was rejected in favor of TPI's).

In response, TPI does not provide any affidavit of Wendell Smith, the party with whom Moore allegedly negotiated in violation of the standstill agreement.  Nor does it point to any other evidence of Moore's alleged violation of that provision.  Instead, it falls back upon speculation and conjecture.

> On or about the 1st of February, right after signing and returning the Letter Agreement, I was informed by Hartman that Wendell Smith, whom I do not know, was offering $4 million for the facility.  I got the distinct impression from this information that Hartman was acting in violation of the standstill agreement embodied in the January 30th Letter [Agreement].  Hartman made it very clear that should our deal not close or if [Moore] thought that there was any chance of our deal not closing he would push the sale to Mr. Smith.

Exhibit 1 to plaintiff's memorandum, Piller affidavit at para. 31 (emphasis supplied).  Again, more is necessary to defeat a properly supported motion for summary judgment.  See, e.g., Serapion, 119 F.3d at 987.  And, parenthetically, it probably bears noting that Moore did not violate the standstill agreement if, as alleged by TPI, its employee/agent, Hartman, simply said that "should our deal not close," he was prepared to go back to one of the parties who, along with TPI, originally proposed to purchase the DAS facility.

C.    Count Three - Negligent Misrepresentation.

In count three of its amended complaint, TPI alleges that it was damaged by Moore's negligent misrepresentation of material facts.  Specifically, it claims that Moore lead it to believe that, if the parties' deal actually closed, TPI would be purchasing the DAS facility as a "going concern."  But, "[a]fter repeated inquiries and in depth due diligence, Plaintiff discovered that the business was not being run as a going concern and that orders were not being accepted in the ordinary course."  Amended complaint at para. 60.[2]  TPI also claims that Hartman had

_____

[2]    As an aside, the court notes that TPI's pleadings and filings are replete with references to the parties' alleged

11

specifically instructed sales personnel to stop accepting new purchase orders.  Id. at para. 59.

Under New Hampshire common law, "[t]he essential elements of negligent misrepresentation are a negligent misrepresentation by the defendant of a material fact and justifiable reliance by the plaintiff."  Ingaharro v. Blanchette, 122 N.H. 54, 57 (1982) (citing Tober's, Inc. v. Portsmouth Housing Auth., 116 N.H. 660, 663 (1976)).  Importantly, however, "mere proof of breach of promise, whether or not the promise is a contractual term, will not support an action for misrepresentation.  Otherwise every contract action would automatically acquire a tandem count in tort, and the tort claim would render nugatory any contractual

agreement that the DAS facility would be sold as a "going concern."  Interestingly, however, Piller obviously recognized that the Letter Agreement did not include any reference to such a provision.  Accordingly, after executing that document, Piller wrote to his attorney: "I have just signed the letter of intent from Moore North America.  I have attached a copy for your records.  Missing from this document is any phrase that states "ON GOING BUSINESS" or similar statement.  So, I have attached a letter to Mr. Sullivan that states that we are working under the assumption that the business being purchase[d] is be[ing] run as an ongoing business . . .."  Exhibit Q to Hartman's memorandum. TPI has not, however, produced a copy of the letter referenced by Piller and allegedly sent to Sullivan, nor has it identified any other evidence which might suggest that there was a "meeting of the minds" on the "going concern" issue, or even what was meant by that phrase.

limitation on liability."  Hydraform Prods. Corp. v. American

Steel & Alum. Corp., 127 N.H. 187, 200 (1985) (citations

omitted).


In support of its motion for summary judgment, Moore points

to language in the parties' "Confidentiality Agreement," which it

says precludes TPI's negligence claim as a matter of law.  That

Confidentiality Agreement, which the parties executed on January

14, 2002, provides, among other things, that:

> Seller makes no representations or warranties, express
> or implied, as to the quality, accuracy and
> completeness of the Confidential Information disclosed
> hereunder.  Seller, its officers, directors and
> employees shall have no liability whatsoever with
> respect to the use of or reliance upon the Confidential
> Information by [TPI].
>
> *  *  *
>
> Except for the matters specifically agreed to in the
> Agreement, [TPI] and [Moore] agree and it is the intent
> of the parties that, unless and until a definitive
> written agreement between [Moore] and [TPI] with
> respect to any transaction contemplated hereunder has
> been signed and delivered, neither [Moore] [n]or [TPI]
> will be under any legal obligation or have any
> liability of any kind whatsoever to any party with
> respect to such a transaction by virtue of this or any
> written or oral expression made by any director,
> officer, employee, agent, advisor or any other
> representative of any of them with respect to such
> transaction.

13

\* \* \*

> This Agreement constitutes the entire agreement and understanding between the parties as to Confidential Information related to the Business and supercedes all prior or contemporaneous <u>communications, negotiations, representations or agreements</u> between the parties with respect thereto. <u>No representations have been made by either of the parties except as are specifically set forth herein</u>.

Exhibit 4-A to Moore's memorandum, Confidentiality Agreement at paras. 4, 9-10 (emphasis supplied). Subsequently, on January 30, 2002, the parties executed the Letter Agreement. As noted above, however, they never finalized the terms of the purchase and sale and, therefore, never executed a definitive purchase and sale agreement.

Moore claims that the provisions of the Confidentiality Agreement quoted above are valid, supported by adequate consideration, and enforceable against the parties. It also says that, as a matter of law, those provisions preclude TPI from pursuing its negligent misrepresentation claim. TPI does not contest the enforceability of those provisions nor does it deny that, generally speaking, the provisions of the Confidentiality Agreement were intended to (and do in fact) bar precisely the

14

sort of negligent oral misrepresentation claim it now advances. TPI does, however, contest the <u>application</u> of those provisions to its current claims against Moore.

Specifically, TPI says that the provisions set forth in the Confidentiality Agreement were only binding until the parties' executed a "definitive agreement . . . with respect to any transaction contemplated hereunder." Confidentiality Agreement, at para. 9. <u>See</u> plaintiff's memorandum at 8-9. And, says TPI, the parties executed just such a "definitive agreement" when they signed the January 30th Letter Agreement. Consequently, TPI asserts that the bar to imposing liability on Moore and its officers for alleged negligent misrepresentations erected by the Confidentiality Agreement was lifted when the parties signed the Letter Agreement.

While clever, TPI's argument lacks substance. The Confidentiality Agreement plainly states that neither party shall have any liability (at least for non-intentional conduct) arising out of or in connection with written or oral representations made during their ongoing negotiations for the purchase and sale of

15

the DAS facility unless and until a "<u>definitive</u> written agreement between [Moore] and [TPI] <u>with respect to any transaction contemplated hereunder</u> has been signed and delivered." <u>Id.</u> at para. 9. And, the "transaction contemplated" by the Confidentiality Agreement is defined in the document's preamble as "the sale by [Moore] of its Document Automation Systems contract manufacturing business." <u>Id.</u> Plainly, then, what is contemplated by the phrase "definitive written agreement" is a binding purchase and sale agreement relating to the DAS facility. <u>See, e.g.</u>, Exhibit 2 to TPI's memorandum (document no. 83), second affidavit of Richard Piller at para. 24 (referring to the "purchase & sale agreement" as the "definitive agreement"). TPI's arguments to the contrary, particularly in light of Piller's own references to the purchase and sale agreement as the "definitive agreement," are unavailing, as is its claim that the provisions of the Confidentiality Agreement were nullified upon execution of the Letter Agreement.

Moreover, even if TPI's negligence claim were not barred by the provisions of the Confidentiality Agreement, Moore would still be entitled to judgment as a matter of law. First, as

16

discussed more fully below, TPI has provided no evidentiary support for its conclusory claim that Hartman (or any other Moore employee) undermined the value of the DAS facility by instructing sales personnel to stop accepting new purchase orders. Second, nothing in the record evidence suggests that, during the period of time at issue in this case, the DAS facility was being operated as anything <u>other</u> than a "going concern." <u>See, e.g.</u>, Exhibit J to Hartman's memorandum, affidavit of Christopher Maher (the controller for the DAS facility), at para. 4(c) (detailing the net sales figures for each month between January and August of 2002). In response, TPI has not pointed to any record evidence supportive of its claim regarding a fifty percent sales decline purposefully induced by Moore. And, to the extent that there even was a decline in sales volume, it could have been caused by any number of economic factors entirely unrelated to Moore's alleged instructions to its employees "not to push for new sales." Amended complaint at para. 59.

Finally, the record reveals that TPI was well aware of Moore's concerns regarding liability that it might incur if it accepted new orders that could not be fulfilled if the proposed

17

sale of the DAS facility to TPI fell through and Moore was forced, instead, to close it.  To the extent that Moore's conduct in that regard might be viewed as a failure to operate the DAS facility as a "going concern" (again, ignoring for the moment that there is no evidence that the parties ever actually agreed that the DAS facility would be sold as a "going concern" or, even if they did, that they agreed what that phrase would actually mean in terms of day-to-day operations of the facility), TPI has not pointed to any evidence suggesting that it was unaware of Moore's concerns or that it was in the dark as to the added level of scrutiny that Moore employees undertook before accepting new orders (in particular, those that could not be fulfilled if the DAS facility had to be closed, as was ultimately the case).  See, e.g., Exhibit R to Hartman's memorandum, letter from TPI's counsel to Moore's counsel (acknowledging that TPI was "cognizant that Moore may wish to limit its potential liability by not accepting purchase orders for equipment, which it will not be able to produce."); Exhibit S to Hartman's memorandum, letter from TPI's counsel to Moore's counsel ("As I indicated in my letter of February 20th, my client is sensitive to [Moore's] wish

18

to avoid, or limit, unnecessary risk [related to new purchase orders].").

Because TPI was well aware of Moore's concerns about limiting potential liability to customers for whom it might not be able to complete sales orders (i.e., if, as happened, it was forced to close the DAS facility), TPI cannot plausibly claim that it was "misled" by any "negligent misrepresentation" made by Moore in that regard.

II.    Hartman's Motion for Summary Judgment.

TPI's amended complaint sets forth two counts against Hartman: tortious interference with contractual relations (count four) and intentional interference with prospective contractual relations (count five).  Hartman moves for summary judgment as to both counts.  TPI objects.

In count four of its amended complaint, TPI alleges that Hartman tortiously interfered with TPI's contractual relationship with Moore as follows:

> When his investment advances were rebuffed, Hartman wrongfully induced or caused [Moore] to breach its Letter Agreement with the Plaintiff by violating the Standstill Period provided for in the Letter Agreement, <u>by instructing sales personnel not to pursue sales and by facilitating, generally, a fifty (50%) percent decrease in DAS sales volume</u> thereby rendering completion of the Definitive Agreement impracticable.

Amended complaint at para. 59 (emphasis supplied).

The substance of TPI's intentional interference with prospective contractual relations claim against Hartman (count five) is the same as that advanced in count four. Specifically, TPI alleges that:

> When his investment advances were rebuffed, Hartman wrongfully, intentionally and improperly interfered with the relationship between TPI and [Moore] by violating the Standstill Period, provided for in the Letter Agreement, by instructing sales personnel not to pursue sales and by facilitating, generally, a fifty (50%) percent decrease in DAS sales volume thereby rendering completion of the Definitive Agreement impracticable.
>
> * * *
>
> Plaintiff asserts that when Hartman's investment advances were rebuffed, <u>he diligently pursued the derailing of the transaction between TPI and [Moore]</u> so that he, Hartman, could sell the facility to "Door #2" from which he, Hartman, might receive a commission, finder's fee or other financial benefit.

20

Amended Complaint at paras. 79 and 81 (emphasis supplied).

Viewed logically, TPI's claims would seem to make little sense: if Hartman were truly interested in derailing TPI's efforts to acquire the DAS facility so that he could find another buyer (and, allegedly, receive some sort of commission or finder's fee), it would have been irrational for him to have purposefully undermined the company's sales - conduct that would, quite obviously, have made it far more difficult to find another willing purchaser and, at a minimum, would have drastically reduced the amount such a purchaser would have been willing to pay for the DAS facility. Few people interested in finding a buyer for a business set fire to it before putting it on the market. But, notwithstanding the apparent lack of a logical theme to TPI's claims, that alone is not a basis to grant Hartman's motion for summary judgment. Accordingly, the court turns to a consideration of that motion on the merits.

As with its objection to Moore's motion for summary judgment, TPI's objection to Hartman's motion lacks any discussion of the applicable law. And, perhaps more importantly,

21

it fails to point out how any of the affidavit testimony upon which it relies relates to any one or more of the essential elements of its claims against Hartman. Instead, TPI simply declares its belief that there are genuine issues of material fact, supporting that assertion with pages of block quotes from various affidavits.

This court (Barbadoro, C.J.) recently discussed the essential elements of both a claim for tortious interference with contractual relations and one for intentional interference with prospective contractual relations.

> To prove a tortious interference with contractual relations claim under New Hampshire law, [plaintiff] must prove that: (1) it had a contractual relationship with [a third party]; (2) [defendant] knew of the contractual relationship; (3) [defendant] wrongfully induced [the third party] to breach the contract; and (4) [plaintiff's] damages were proximately caused by [defendant's] interference. Roberts v. General Motors Corp., 138 N.H. 532, 539 (1994); Nat'l Employment Serv. Corp., 145 N.H. at 162. "'Only improper interference is deemed tortious in New Hampshire.'" Id. (quoting Roberts, 138 N.H. at 540).
>
> * * *
>
> [Plaintiff] also claims that [defendant] interfered with [plaintiff's] prospective contractual relations by wrongfully inducing [the third party] not to enter into a long-term agreement. The elements of this tort are

22

described as follows: "One who, without a privilege to do so, induces or otherwise purposely causes a third person not to. . . enter into or continue a business relation with another is liable to the other for the harm caused thereby." <u>Baker</u>, 121 N.H. at 644 (quotation omitted).

<u>Alternative Systems Concepts, Inc. v. Synopsys, Inc.</u>, 229 F. Supp. 2d 70, 73-74 (D.N.H. 2002). <u>See also</u> <u>Sheppard v. River Valley Fitness</u>, 2001 DNH 177 at 16-19 (D.N.H. Sept. 28, 2001) (discussing the law applicable to claims for intentional interference with a prospective contractual relations, as well as the exceptional circumstances under which an employee who acts outside the scope of his or her employment and is motivated by bad faith, personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff, may be liable for his or her conduct).[3]

------

[3] Because Hartman is entitled to judgment as a matter of law on other grounds, the court need not address his claim that he was, at all material times, acting within the scope of his employment and, therefore, shielded from liability as to TPI's tort claims. That is, because there is no evidence that Hartman actually interfered with TPI's prospective contractual relationship with Moore, the court need not determine whether he was acting outside the scope of his employment and motivated by ill-will or spite toward TPI and/or its principal, Piller.

As noted above, the "evidence" upon which TPI relies in support of its claims (and in opposition to Hartman's motion for summary judgment) consists almost entirely of speculation and conjecture. For example, in response to an interrogatory seeking a specific description of how Hartman "improperly interfered" with any contractual relations between TPI and Moore, TPI provided the following:

> Hartman time and time again throughout this transaction <u>continued to brag that he had other offers</u> and if TPI did not get this deal done, he would open door number 2 the "Wendell Smith offer." <u>This action was in violation of the standstill agreement</u>.

> Hartman interfered with ongoing business with AGFA <u>by placing several phone calls to AGFA management</u> and to the point of calling one of their purchasing managers "Eddie the Weasel."

> <u>Hartman continued to talk to Bob Brown his ex-boss at Harris about doing the deal with himself/Hartman</u>. This action was in violation of the standstill agreement.

> <u>Hartman lied</u> about his ability to in fact deliver the Peak spare parts and equipment orders. Hartman knew that this was a key part of the DAS business plan and that it was needed to operate an ongoing business.

> <u>Hartman lied</u> about his ability to in fact deliver the Continuous Products LM 20 equipment orders. Hartman knew that this was a key part of the DAS business plan and that it was needed for the ongoing business.

24

Exhibit M to Hartman's memorandum, TPI's answers to Hartman's interrogatories (emphasis supplied).

In support of those claims, TPI relies almost exclusively on the self-serving and largely speculative affidavit of its president, Richard Piller. Notably, TPI has not produced an affidavit from Bob Brown, the party with whom Hartman was allegedly negotiating in violation of the standstill agreement. Nor has it produced any evidence (in the form of an affidavit, deposition testimony, etc.) from representatives of AGFA, which might support its claim that Hartman placed "several phone calls to AGFA management" (nor has it described how placing phone calls to a customer might conceivably violate the standstill agreement). Nor has it explained how Hartman's alleged "bragging" about his ability to sell the DAS facility to Wendell Smith should the deal with TPI fall through constitutes actionable conduct in violation of the standstill agreement - plainly, if the deal with TPI did not materialize, Hartman was not only free to seek other potential purchasers, it was his job to do so.

Hartman, on the other hand, has produced, among other things, an affidavit of Bob Brown who, according to TPI, is one of the parties' with whom Hartman allegedly negotiated in violation of the standstill agreement. Mr. Brown testified:

> During the period from January 30, 2002 through April 2002, I did not initiate or otherwise engage, directly or indirectly, in any communication with Raymond Hartman regarding the DAS Facility. Mr. Hartman did not attempt to communicate with me during this time period.
>
> In late February or early March, by mutual agreement, I had a meeting with Richard Piller. We discussed, generally, Mr. Piller's efforts to negotiate a purchase and sale agreement for the DAS facility with Moore. During that conversation, <u>I told Mr. Piller that I had not had any conversations with Ray Hartman after the submittal of my group's offer to purchase [which Moore rejected], nor had Mr. Hartman made any effort to contact me</u>.

Exhibit F to Harman's memorandum, affidavit of Robert Brown at paras. 4-5 (emphasis supplied).[4] <u>See also</u> Exhibit G to Hartman's memorandum, Affidavit of Thomas Carroll. Thus, in light of the record evidence, there appears to be no factual basis at all for

---

[4]     Among other things, that testimony (if credited as true), coupled with a decided dearth of contrary evidence from Piller and TPI, calls into question whether there was a good faith basis for Piller to assert (in an affidavit and elsewhere) that Hartman had engaged in negotiations with Brown during the standstill period.

26

TPI's repeated claim that Hartman "violated the standstill agreement" by conducting negotiations with Mr. Brown or other parties who had expressed an initial interest in purchasing the DAS facility.

Nor is there any evidence to support TPI's claim that Hartman "instruct[ed] sales personnel not to pursue sales and facilitat[ed], generally, a fifty (50%) percent decrease in DAS sales volume." Amended complaint at para. 79. In support of that particular claim, TPI points to the affidavit of Rebecca Averill Loh, which provides:

> On or about Saturday, February 23rd, 2002, I overheard a telephone conversation between Piller and Hartman. I recall being shocked by the change in Hartman's demeanor as he was irate and irrational seeming to me like a person boxed in a corner trying to get out.
>
> The telephone conversation covered myriad subjects including the fact that Bill Ceccherini, the executive in charge of day-to-day operations at DAS, had allowed Piller to hear the following voicemail message:
>
>> Bill, this is Ray Hartman calling. Listen I am traveling today and am with Sean Sullivan. Would you give me a call please because we ought to take these orders on a 1 by 1 basis and understanding what we are coming up against in terms of risk management and what the value [of these orders] is. I do not want to lose business for the buyer but at the same time I need to know the exposure.

27

So let's talk about this and please give me a call.

Exhibit 4 to plaintiff's memorandum, affidavit of Rebecca Averill Loh at paras. 9-10. Parenthetically, it is unclear whether Ms. Loh has any personal knowledge of the contents of that particular voicemail message, since it does not appear from the face of her affidavit that she was actually permitted to listen to it. See Fed. R. Civ. P. 56(e). Nevertheless, even accepting her testimony at face value, it does not support TPI's claim.

TPI was aware that, in November of 2001, Moore publically announced its intention to shut down the DAS facility due to substantial financial problems that put it on the verge of bankruptcy. See D-1 to Hartman's memorandum, affidavit of Sean Sullivan and attached copy of newspaper report of the planned closing of the DAS facility. TPI also knew that, shortly after it announced its plan to close the DAS facility, Moore began notifying companies in the printing industry that it would consider offers to purchase the DAS facility and the underlying real estate (TPI and at least three other companies expressed interest). And, as noted above, TPI knew of Moore's concern that

28

it not accept sales orders that it could not fulfill (given the fact that, if it could not sell the facility, it would have to be shut down).  <u>See, e.g.</u>, Exhibit R to Hartman's memorandum, Letter from TPI's counsel to Moore's counsel (acknowledging that TPI was "cognizant that Moore may wish to limit its potential liability by not accepting purchase orders for equipment, which it will not be able to produce.").

Contrary to TPI's suggestion, the telephone message left by Hartman does <u>not</u> support its claim that he specifically instructed sales personnel to stop accepting new orders.  Rather, it simply suggests that Hartman was (justifiably) concerned that the DAS facility not accept orders it could not fulfill - a concern which, as noted above, TPI knew Moore had.  In fact, Hartman's message specifically states that he wanted the sales staff to assess each individual order with that concern in mind; it does not even remotely suggest that Hartman instructed them to stop taking all new sales orders.

As to TPI's claim that Hartman "lied" about his ability to secure various sales contracts, the court need only make two

brief observations.  First, TPI has failed to support those claims with anything other than conclusory allegations.  Second, even assuming that Hartman did "lie" about his ability to "deliver the Peak spare parts and equipment orders" and "his ability to in fact deliver the Continuous Products LM 20 equipment orders," TPI has failed to articulate how such (alleged) conduct fits into its theory that Hartman tortiously interfered with TPI's relationship with Hartman's employer, Moore.  The essence of TPI's claims is that Hartman purposefully devalued the DAS facility by directing sales staff to stop taking incoming orders (and, although not part of TPI's amended complaint, that he violated the provisions of the standstill agreement) - alleged conduct that is directly at odds with the assertion that he repeatedly lied in an apparent effort to suggest that the DAS facility had greater sales than it actually did (and, at least implicitly, that it was worth more than it actually was).

The court need not belabor the point.  In response to Hartman's thorough (even methodical) motion for summary judgment, TPI has failed to identify any genuine issues of material fact

that might deflect the entry of judgment as a matter of law in favor of Hartman as to TPI's tortious interference with contractual relations claim (count four) or its intentional interference with prospective contractual relations claim (count five). Instead, it has opposed the granting of that relief solely on the basis of speculative and conclusory affidavit testimony (at least some of which does not appear to be based on personal knowledge) and illogical, even self-contradictory, theories of its own case.

III. <u>TPI's Motion to File a Surreply</u>.

TPI's motion for leave to file surreply (document no. 88) is denied. Among other deficiencies, that motion fails to comply with local rule 7.1(c), relating to non-dispositive motions (counsel for TPI incorrectly represents that such a motion is dispositive in nature). <u>See also</u> L.R. 7.1(e)(3) ("Motions for leave to file a surreply will only be granted under extraordinary circumstances). TPI has failed to demonstrate that this case presents "extraordinary circumstances" warranting the relief it seeks. <u>See generally</u> Hartman's objection (document no. 89).

To the extent that motion also seeks relief under Rule 56(f) of the Federal Rules of Civil Procedure, it is likewise denied. As was the case with TPI's last Rule 56(f) motion, its current motion fails to comply with the requirements of Rule 56(f). See generally Mass. Sch. of Law at Andover, Inc. v. American Bar Ass'n., 142 F.3d 26, 44 (1st Cir. 1998); Resolution Trust Corp. v. North Bridge Assoc., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994). See also Technology Planning Int'l, LLC v. Moore North America, Inc., 2003 DNH 018, at 3 (D.N.H. Jan. 24, 2003) (denying an earlier Rule 56(f) motion filed by TPI (but affording TPI additional time within which to object to summary judgment) and explaining the various essential elements of a properly supported Rule 56(f) motion).

Moreover, since TPI has elected to file an objection and supporting memorandum in response to defendants' motions for summary judgment, its efforts to obtain relief under Rule 56(f) are untimely; having elected to "meet [defendants'] summary judgment challenge head-on," TPI cannot now seek to "fall back on Rule 56(f) if its first effort is unsuccessful." C.B. Trucking, Inc. v. Waste Management, Inc., 137 F.3d 41, 44 (1st Cir. 1998).

32

## Conclusion

While the voluminous record in this case may contain hidden morsels supportive of TPI's claims, TPI has elected not to call them to the court's attention.  And, the court is not inclined to embark upon a search of that record in an effort to locate that which TPI could have, but did not, identify.  Nor is it inclined to develop legal arguments that TPI could have, but did not, advance and brief.  <u>See generally</u>, <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed."); <u>Kauthar SDN BHD v. Sternberg</u>, 149 F.3d 659, 668 (7th Cir. 1998) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.").

Counsel is no doubt busy and anxious to practice in a manner that is as efficient as possible.  But, shifting research, pleading, and briefing responsibilities to the court is not a viable option.  As Justice Scalia, then sitting on the Court of Appeals for the District of Columbia Circuit, has observed:

The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.  Thus, Rule 28(a)(4) of the Federal Rules of Appellate Procedure requires that the appellant's brief contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on."  Failure to enforce this requirement will ultimately deprive us in substantial measure of that assistance of counsel which the system assumes - a deficiency that we can perhaps supply by other means, but not without altering the character of our institution.  Of course not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through our own deliberation and research.  But where counsel has made no attempt to address the issue, we will not remedy the defect, especially where, as here, "important questions of far-reaching significance" are involved.

Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983) (citations omitted).  The same principles apply with equal force at the district court level.


For the reasons expressed in this opinion and for those set forth in both Moore's memorandum and its reply memorandum, Moore's motion for summary judgment (document no. 45) is granted.  Hartman's motion for summary judgment (document no. 72) is, for the reasons discussed above, as well as those set forth in

34

Hartman's memorandum, granted to the extent it seeks entry of judgment as a matter of law in Hartman's favor as to counts four and five of TPI's amended complaint. It is, however, denied to the extent Hartman seeks an award of attorneys' fees. TPI's motion to file a surreply and for relief under Rule 56(f) (document no. 88) is denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 23, 2003

cc: William M. Richmond, Esq.
Daniel P. Luker, Esq.
Sigmund D. Schutz, Esq.
Arpiar G. Saunders, Jr., Esq.